## FLEMING *v.* BRUNNER ET AL.

[No. 76, September Term, 1960.]

98

*Decided January 13, 1961.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Nevin E. Leese,* with whom was *T. Hunt Mayfield* on the brief, for the appellant.

*John L. Clark* for the appellee Katherine M. Brunner.

*C. Orman Manahan* for the appellees Henry Ellicott Brunner and wife and Roger M. Tittsworth and wife.

*Joseph Patti, Jr.,* on the brief for the appellee Federal Land Bank of Baltimore.

HORNEY, J., delivered the opinion of the Court.

Susan C. Fleming (the plaintiff-appellant) in a bill of complaint against Henry E. Brunner and others (the defendants-appellees) sought to recover a share of the estate devised or bequeathed to her by the last will and testament of her father. When the chancellor dismissed the bill on the ground of laches, the plaintiff appealed.

The testator, Frederick A. Brunner, died on December 9, 1939, seized and possessed of a ninety acre farm in Howard County. As his survivors, he left six adult children, namely, Henry, Victor, August, Louise, Anna and Susan, all of whom,

except Henry and Victor, were living away from the farm. In his lifetime, the testator had mortgaged the farm to Herbert H. Cross and his wife (Cross, Crosses or mortgagees) to secure a loan of $2400, which had not been repaid when the testator died.

By the terms and provisions of his will, the testator, after directing payment of his debts, gave and devised all of his property, real and personal, to Henry upon the following conditions: that Victor should have a life estate in all properties; that if the farm should be sold—either upon the order of Henry "or otherwise"—Henry should retain one-fifth of the net proceeds, Victor should receive one-fifth and the other four children should each receive 15%; that (in the event of a sale) the cost of all permanent improvements as well as any payment on account of the indebtedness on the farm and the liquidation costs should be refunded to Henry before a division was made; that if Victor should die before a sale was made, the property should be divided (in five equal parts) among the remaining children, or if any should be dead, then among the heirs of the deceased child or children; and that Henry should be the executor of the will.

After the will was probated and the executor had qualified as such, an inventory of real property was filed, but nothing further was done with respect to the administration of the estate. Apparently the farm was the only asset of any consequence. And, although there were other outstanding debts and claims against the estate besides the mortgage debt, interest and taxes, there were no liquid assets with which to pay such indebtedness.

In this situation, Victor, the life tenant, in an effort to solve the problem, devised a plan whereby he, in exchange for a quit-claim deed to the farm from all of the remaindermen, would assume the payment of the mortgage debt and interest and all other indebtedness, including the taxes and administration expenses. The plan however came to naught when Susan refused to quit her claim. Thereafter, on the advice of his attorney—who was also the attorney for the mortgagees— to the effect that the best solution as well as the "cheapest

thing to do" was to allow the mortgage to be foreclosed, the life tenant deliberately permitted the interest and taxes to go unpaid so as to induce a foreclosure sale.

When default occurred, the mortgagees assigned the mortgage to the attorney for the purpose of foreclosure and collection and the farm was duly advertised for sale. On the morning of the day of sale, Cross agreed with Victor that he would bid the property in for him at a price which would satisfy the mortgage indebtedness, taxes and costs. This was done. The sale was reported as having been made to the Crosses and on July 8, 1941, the farm was conveyed to them. But the Crosses, reneging the agreement with the life tenant, refused to reconvey the farm to him. However, the lower court, in a suit by the life tenant against the Crosses to enforce the constructive trust, directed them to convey the farm to him upon the payment of the sale price plus interest. Subsequently, through the use of straw conveyances, title to the farm was vested in Victor and his wife (Katherine) as tenants by the entireties. Approximately a year later, Victor and Katherine sold and conveyed a lot of land out of the farm to Henry and his wife (Elizabeth), who built a home on it and mortgaged it to pay the cost thereof. Later, when there was some discussion about Susan also buying a lot, Victor and his wife offered to give her an acre or so of land, but Susan declined to accept a gift saying she preferred to buy it.

Victor and Katherine, before his death on August 5, 1957, had made extensive improvements to the barn, erected sheds, installed electricity, expended substantial sums on soil building and for general repairs, and had also paid all claims against the estate of the testator except the funeral expenses. When Victor died the farm was encumbered by a mortgage on which there was a balance due of approximately $3000.

The plaintiff, who resided in Baltimore, had left the farm long before her father died, but returned frequently to visit him in his lifetime, and he often went to Baltimore to see her. She claimed she did not know her father had made a will though she admitted that it had been witnessed by two postal employees who worked with her husband at the post office.

She further stated she was not aware that a will had been probated or that letters testamentary had been issued to Henry. She had made no inquiry as to what interest she might have in the personalty or the farm. She knew there was a funeral bill, but, since no one had asked her to share the expense, she had not offered to pay a part of it. She acknowledged that Henry on behalf of Victor had asked her to sign a paper, and admitted that she refused to sign it or even examine it, and Henry had not explained its contents. Thereafter, she did not visit on the farm, claiming she was not welcome because she had declined to execute the document. She continued, however, to visit her sisters in Howard County from time to time, but denied she had ever discussed the estate with them. She knew that Henry had built a house on the farm and had visited him there. She claimed, however, that she had heard nothing about the mortgage foreclosure sale and the subsequent equity proceeding brought by Victor to require a conveyance of the farm by the Crosses to him. She explained she had not been curious about the ownership of the farm in all of the subsequent years between the deaths of the testator and the life tenant because her father had told her that he wanted Victor to have a home on the farm as long as he lived. And she had, for that reason, never inquired about the title until after the death of Victor. All of these matters, she claimed, were revealed to her by the attorney she retained after the death of the life tenant.

Other witnesses at the trial of this case flatly contradicted the plaintiff in several respects. One, a niece, testified that when her aunt Susan had subsequently visited her mother (Louise) they had discussed the paper that Henry had taken to Susan for her signature. Another niece testified that when this suit was filed she had asked her aunt Susan "what she wanted," and that the plaintiff had replied she "wanted her share" of the farm. When she was asked further "why she had waited so long," she answered that the farm "wasn't worth anything then [referring to the death of the testator], but it is now." There was also evidence that her father sometime before his death had conveyed ten acres of the farm to the plaintiff, but she claimed that that conveyance was only a

means of conveying title to another and that her father had received the consideration for it. After the death of the life tenant, Anna and Henry quit-claimed all their right, title and interest in the farm to Katherine. The record does not show whether or not any of the other interested parties did likewise.

The chancellor, as his opinion indicates, did not believe the material parts of the plaintiff's testimony, particularly her claim that she was not aware of the existence of the will, the mortgage foreclosure sale and the suit in equity to compel conveyance of the farm to the life tenant. On the contrary, the chancellor found it was not unreasonable to assume that the plaintiff did have knowledge of the several transactions referred to, and that she had concluded, either with or without knowledge of the contents of the will, that her interest was valueless.

Specifically, the chancellor found as a fact that the plaintiff knew "long prior to the death of Victor, not only of the existence of the will but also of the subsequent litigation, or, at least, of the fact that Victor claimed the farm adversely to whatever interest which she might have had in it." He further found that in the intervening period between the death of the testator and the death of the life tenant that the "debts had been paid, improvements had been made to the property, a portion of it had been conveyed away and built upon, and real estate values had risen enormously." In so finding, we cannot say the chancellor was clearly wrong. See Maryland Rule 886. It was for these reasons that the chancellor held that "the claim [of the plaintiff], irrespective of its merits, has been asserted too late."

The plaintiff-appellant on this appeal contends: (i) that the action of Victor in attempting to acquire a fee simple title to the farm by means of the foreclosure sale was a breach of trust and a fraud on the rights of the remaindermen; (ii) that Victor, as a life tenant, could not acquire a title to the farm which would defeat the interests of the remaindermen; and (iii) that the plaintiff was innocent of laches. The defendants-appellees, in addition to defending the ruling of the chancellor on the question of laches, assert that Victor instead of taking

a conventional life estate took one which was subject to divestment in the event of a sale which became inevitable when the devisees failed to settle the estate, and was so divested, wherefore the relation of life tenant and remainderman never came into existence.

The assertion that the life tenant was never vested with an estate for life is easily disposed of. The claim that no one took anything under the will because the estate was never administered and because the claims and debts were not paid by the executor is clearly without substance. While title to the personal estate of a decedent, including leasehold estates, can be transmitted only through administration of the estate (*Rockwell v. Young*, 60 Md. 563 [1883]), there is no such requirement with respect to an interest in land such as a life estate therein. This is so because administration on the estate of a decedent being purely statutory, the testamentary statutes—other than requiring the filing of an inventory of real estate and the giving of a notice to creditors—do not in anywise impede the immediate transfer of title to real estate to the devisees or heirs at law of the decedent, as the case may be depending on whether the decedent died testate or intestate. Thus, in the instant case, even if no inventory had been filed and no notice to creditors had been given, only the probate of the will was necessary to give effect to the devise of a life estate to the life tenant. The fact that the life estate was subject to being divested in the event of a sale had no bearing on its vesting immediately upon the death of the testator.

We turn now to the first two contentions of the plaintiff-appellant. Since they involve separate aspects of the same issue in that they concern the rights of the life tenant and the remaindermen when the life tenant undertook to purchase the mortgaged land at a foreclosure sale, we shall consider them together.

### (i) and (ii)

The general rule and the reason for it, as stated in 1 Tiffany, *Real Property* (3rd ed.), § 68, is:

> "[The life tenant] cannot, it has been held, be the purchaser at the foreclosure sale, and in case he does,

"he thereby restores the life estate and the estate in remainder, and apart from any question of default on his part, it has been considered that there is, between life tenant and remainderman, such a relation of confidence that if the life tenant purchases at foreclosure sale, or otherwise acquires a paramount title, the remainderman is entitled, upon contributing to the purchase price, to share in the benefit of the purchase."

The Restatement, *Property,* § 149, and Simes and Smith, *Law of Future Interests* (2d ed.), § 1700, in substance state the same general rule. Other texts, such as 33 Am. Jur., *Life Estates, Remainders, Etc.,* § 463, and 31 C.J.S., *Estates,* § 35, in stating the general rule, also include the "reasonable time" requirement referred to in some of the cases. For instance, American Jurisprudence, in setting forth the rule includes the "reasonable time" element by saying: "[T]he purchase of land by a life tenant at a foreclosure sale under a mortgage or deed of trust will be deemed to have been made for the benefit of the remainderman or reversioner if he contributes his portion of the purchase money *within a reasonable time."* [Emphasis supplied.]

The cases stating the general rule, including those which specifically refer to the "reasonable time" element, comprise, among others, *Rushton v. McLaughlin,* 104 So. 824 (Ala. 1925); *Hager v. Connolly,* 263 S. W. 723 (Ky. 1924); *Witcher v. Hanley,* 253 S. W. 1002 (Mo. 1923); *Abney v. Abney,* 62 So. 64 (Ala. 1913); *Upton v. Merriman,* 133 N. W. 977 (Minn. 1911); *Peak v. Peak,* 128 S. W. 981 (Mo. 1910); *Morrison v. Roehl,* 114 S. W. 981 (Mo. 1908); *Cockrill v. Hutchinson,* 36 S. W. 375 (Mo. 1896); *Meads v. Hutchinson,* 19 S. W. 1111 (Mo. 1892); *Allen v. De Groot,* 11 S. W. 240 (Mo. 1889).

Since we think there is little doubt that the life tenant, in acquiring title to the farm through the foreclosure sale — whether directly or indirectly is immaterial—had the effect of restoring the life estate and remainders, the final and more important question is whether the claim of the plaintiff was asserted too late.

(iii)

On the question of whether the plaintiff is innocent or guilty of laches, the authorities have reached divergent opinions. On the one hand there are those cases and authorities which hold or state that if a beneficiary is aware that a constructive trustee is not actually holding the property in trust, but on the contrary asserts or claims a title in fee, the failure of the beneficiary to seasonably assert his (or her) claim, might under some circumstances constitute laches or a waiver. This theory, of course, necessarily assumes that the remainderman *could* have asserted her rights had she acted sooner. On the other hand, there is the general real property rule that laches do not begin to run against a remainderman until his interest has become possessory. Under this theory—since, by definition, laches is the failure to assert a right—the remainderman had no right she *could* assert until the death of the life tenant.

The property rule referred to was recently reiterated by this Court in *Hungerford v. Hungerford,* 223 Md. 316, 164 A. 2d 518 (1960). While the question in the *Hungerford* case did not involve a controversy between a remainderman and a life tenant as is the case here, but concerned a claim of adverse possession by a party who was neither a life tenant nor a remainderman against remaindermen who were without a possessory interest when adversary possession was alleged to have started, it appears that the general rule is not different when a life tenant purports to acquire a fee by purchase at a mortgage foreclosure sale in that the right of the remainderman to act begins only when the life tenancy ends. See Simes and Smith, *op. cit., supra,* § 1965. However, in a case such as this, where in effect a legal fraud on the remaindermen was charged and the finding was that the remainderman making the claim knew of the alleged wrongful adverse holding long before the death of the life tenant, there was no reason why the remainderman could not have sought a declaration of her rights or status by a declaratory decree within a reasonable time after she became aware of the adverse holding. Cf. *Willoughby v. Trevisonno,* 202 Md. 442, 451, 97 A. 2d 307 (1953). If she could have sued sooner, then it appears laches would run from that time.

Furthermore, there are cases to the effect that if a life tenant makes his hostile claim of the fee known to the remainderman, his possession becomes adverse and starts the statute running. Most of the decisions along this line appear to be dicta, but there is at least one case which held that there are exceptions to the general rule. In *Brittenum v. Cunningham,* 220 S. W. 2d 100 (Ky. 1949), the Court of Appeals of Kentucky, in stating the general rule that laches, estoppel or limitations do not ordinarily run against a remainderman prior to the termination of the life tenancy, nevertheless recognized what it characterized as "outstanding" exceptions to the general rule. At p. 102, it was said:

> "Two outstanding examples of cases coming under exceptions are, first, where the life tenant undertakes to dispose of, or enlarge upon, the estate and brings home to the remainderman notice of the adverse holding in such a manner as to indicate a repudiation of life tenancy. The other is where the person, under whom the remainderman asserts a derivative right, undertakes to transfer title to the real estate, in which case possession thereunder for the statutory period bars the remainderman's right to recover the land."

The Kentucky Court, in applying the second exception to the facts in that case, had no reason to apply the other exception. Here, however, where the life tenant undertook to enlarge the life estate and the chancellor found that the remainderman knew that the life tenant claimed the farm in fee adversely to whatever interest she asserted therein, it may well be that the exception first delineated in the *Brittenum* case could be applied to the adverse holding.

We conclude, however, that the particular facts of this case call for a decision based on the equitable doctrine of laches. Since there is nothing in the record to indicate or even suggest that the plaintiff ever contributed or offered to contribute her proportionate share of the purchase money, as she should have done, within a *reasonable time* after the adverse claim of the life tenant became known to her, we think it would be

inequitable to permit her to do so now after the death of one of the record owners and after the property had been extensively improved by them and thereby enhanced in value.

In addition to the line of cases stating the "reasonable time" requirement,[1] there are other cases in which waiver or the doctrine of laches was applied to the belated claims of remaindermen or reversioners for relief. See, for example, *Cockrill v. Hutchinson, supra,* where a life tenant had purchased the "fee" at a foreclosure sale and subsequently conveyed the property to a bona fide purchaser without notice, the Court—even though the holding was in favor of the bona fide purchaser—appears to have rested its decision squarely on the laches of the remainderman when it said (at p. 377 of 36 S. W.) that the remainderman having "long slept on her rights, without any manifestation of a desire to share the burdens of the purchase by [the life tenant] at the mortgagees sale, and thereby avail herself of its possible benefits, until the property has been improved and greatly enhanced in value, it would be inequitable to now permit her to do so"; *Hager v. Connolly, supra,* where it is indicated (at p. 724 of 263 S. W.) that it is generally necessary "for the remainderman to plead an offer of reimbursement or their willingness to reimburse as a condition precedent to the recovery of the property"; *Abney v. Abney, supra,* where the Court, in referring to the fact that the reversioners should have averred an offer

---

1. See Witcher v. Hanley, *supra,* at p. 1003 ["The general rule is that the purchase by the life tenant at a sale under a deed of trust on the property is 'deemed to have been made for the benefit of the remaindermen, if they contribute their portion of the purchase money *in a reasonable time*' "]; Peak v. Peak, *supra,* at p. 985 ["(T)he uniform ruling has been that the purchase of land at a foreclosure sale * * * by a life tenant will be deemed to have been made for the benefit of the remaindermen if they contribute their portion of the purchase money *within a reasonable time*"]; and Rushton v. McLaughlin, *supra,* [Since the husband had purchased the life estate of his wife, he was in the same position as she would have been in, *i.e.,* "quasi trustee to the reversioners," and as such could not claim the fee if the reversioners contribute their share of the purchase money *within a reasonable time*]. (Emphasis supplied in first two cases.)

to refund a proportionate share of the cost, stated (at p. 66 of 62 So. 64) that "[b]y suffering a decree for the foreclosure of the mortgage to go against them without asserting their rights in this regard, they have effectively waived and lost them"; *Morrison v. Roehl, supra,* where it was held that the life tenant took a fee and that "until contribution was made, neither the remainderman nor their grantees can attack the title"; and *Meads v. Hutchinson, supra,* where the Court refused to apply the general rule because the remaindermen had not offered to contribute a part of the purchase price paid by the life tenant at the foreclosure sale.

There are no Maryland cases directly in point, but compare *Needles v. Martin,* 33 Md. 609 (1871), where it was held that long possession and continued use of leasehold property by a testamentary trustee under a claim adverse to that of the *cestui que trust* constituted a bar in equity; *Love v. Rogers,* 118 Md. 525, 85 Atl. 771 (1912), where it was held that laches constituted a valid defense to the purchase of trust property by a "trustee" (who had assumed the trusteeship) because there had been a lapse of seventeen years and no satisfactory explanation for the delay in filing suit until after the death of the trustee; *Dorsey v. Stone,* 197 Md. 220, 78 A. 2d 757 (1951), where it was held that a bill, seeking to impress certain farms deeded by the father of the plaintiffs to an uncle with a constructive trust, was properly dismissed on demurrer for laches because suit had not been filed until twenty-one years after the death of the father and after the uncle had also died; *Mitchell v. Cassedy,* 200 Md. 339, 89 A. 2d 620 (1952), where it was held on demurrer, on a bill against the statutory trustees for an accounting of a share of the assets of a dissolved corporation, that a party otherwise entitled to restitution was barred from recovery because the claimant had failed to file suit for so long a time and under such circumstances as made it inequitable to permit further prosecution of the suit. Though not directly in point, these cases clearly indicate that the defense of laches in some circumstances would be available to a trustee of a constructive trust.

Since the purchase of the farm at the foreclosure sale was

not absolutely void but only voidable, we hold that the facts and circumstances in this case were such as to make the defense of laches available to the life tenant (and those claiming under him) as the implied trustee under the constructive trust which was forced on his conscience by operation of law. The decree will therefore be affirmed.

*Decree affirmed; the appellant to pay the costs.*

PRESCOTT, J., dissents.